In the Matter of the Application of PHILLIP T. FERRIS for a Writ of Habeas Corpus, *Petitioner,* v. TY LOCKETT, Sheriff of Sedgwick County, *Respondent.*

No. 39,455

In the Matter of the Application of CECIL L. COURTNEY for a Writ of Habeas Corpus, *Petitioner,* v. TY LOCKETT, Sheriff of Sedgwick County, *Respondent.*

No. 39,459

In the Matter of the Application of RAY PARKS for a Writ of Habeas Corpus, *Petitioner,* v. TY LOCKETT, Sheriff of Sedgwick County, *Respondent.*

(267 P. 2d 190)

Opinion filed March 3, 1954.

*Payne H. Ratner,* of Wichita, argued the cause, and *Louise Mattox, Payne H. Ratner, Jr., Russell Cranmer, Dale B. Stinson, Jr., Starr Calvert, Jr., Carroll Pope,* and *Keith Eales,* all of Wichita, were with him on the briefs for the petitioners.

*Warner Moore,* county attorney, and *Paul R. Kitch,* of Wichita, argued the cause, and *Manford Holly, Charles D. Anderson, Dale M. Stucky,* and *Donald R. Newkirk,* all of Wichita, were with them on the briefs for the respondent.

*Harold R. Fatzer,* attorney general, *Paul E. Wilson,* assistant attorney general, and *Roy Kirby,* of Coffeyville, were on the briefs *amicus curiae.*

The opinion of the court was delivered by

WEDELL, J.: Three original habeas corpus proceedings have been consolidated upon request of the parties. The petitioners are Cecil L. Courtney in case No. 39,455, Phillip T. Ferris in case No. 39,454, and Ray Parks in case No. 39,459.

An inquisition was conducted in the district court of Sedgwick county upon request of the Sedgwick county attorney to make inquiry into certain offenses against the laws of the state of Kansas. His request for the inquisition was based on alleged damage to and destruction of real and personal property by use of paint bombs, fire bombs and fluid bombs and assaults and battery in connection with a taxicab strike in Wichita, by persons whose names were unknown to him. The purpose of the requested inquisition was the prevention of similar further occurrences and to determine the names of the guilty parties in order that they might be punished for violation of the laws of Kansas.

In the inquisition petitioners were guaranteed immunity from prosecution for the violation of any state laws concerning which they might testify. They were informed the guarantee of immunity did not include immunity from prosecution for perjury if committed by them in the course of the inquiry.

Petitioners were sentenced to serve terms of imprisonment in the county jail for direct contempt of court by reason of their refusal to answer certain questions propounded to them during the investigative proceedings.

It is conceded that for all practical purposes the petitions for the writ are identical, except as to parties, insofar as alleged grounds for release from custody are concerned. The alleged illegality of their sentences and commitments, recited in the petitions, will be considered under their respective contentions.

We pause to state petitioners' motions to strike certain paragraphs of respondent's answers have been examined. If the matters

petitioners seek to have stricken from the answers "do not add or detract from the issues," as their motions state, such allegations can hardly be characterized as prejudicial. In that respect the exhibits attached to defendant's answer are quite similar to those attached to petitioners' replies. In any event we agree with counsel for petitioners that some of the matters sought to be stricken are not entirely germane to the legal issues before us. They do, however, disclose some of the background which prompted the request for the inquisition and to that extent they are pertinent.

This court is in nowise presently concerned with the cause or causes of the strike or with attaching blame therefor. Nor is it our present function to intimate even remotely who may or may not be guilty of violating any criminal laws of this state. Those subjects are all entirely foreign to any issue now before us. The sole question to which we now are required to address our attention is whether petitioners, irrespective of the group or organization to which they may belong, if any, have been deprived of their liberty in contravention of their constitutional privileges and guarantees or other legal rights. The first question is does G. S. 1949, 62-301 authorize this investigative proceeding? It reads:

"If a county attorney, attorney general, or assistant attorney general shall be notified by any officer or other person, or shall have knowledge of any violation of any law of this state relating to gambling, intoxicating liquors, or of any violation of any law where the accused is a fugitive from justice, it shall be his duty forthwith diligently to inquire into the facts of such offense, and for that purpose he is hereby authorized to issue subpoenas for such persons as he shall have any reason to believe have any information concerning, or knowledge of such offense, to appear before him at a time and place to be designated in the subpoena, then and there to testify concerning any offense against the laws of the state; *or said county attorney, attorney general or assistant attorney general may file with the judge of the district court, a judge of the city court, or with some justice of the peace of the county, a written statement signed by him, alleging any offense against the laws of this state and such judge or justice of the peace shall, on the written praecipe of the county attorney, attorney general or assistant attorney general, issue a subpoena for the witnesses named in such praecipe, commanding such witnesses to be and appear before such judge or justice of the peace at the time stated in such subpoena, to testify concerning any offense against the laws of the state.* Such subpoena may be served by the sheriff or any constable of the county, or by any other person, a citizen of the county, and shall be served and returned to such county attorney, attorney general, assistant attorney general, judge or justice of the peace, in the same manner subpoenas are served and returned when issued by justices of the peace. Each witness shall be sworn, true answers to make to all questions propounded to him touching the matter of information, and the testimony of each witness shall be reduced to writing and signed by the witness; for the purpose herein

the county attorney, attorney general and assistant attorney general are authorized and empowered to administer oaths and affirmations to such witnesses. *Any disobedience to the subpoena of the county attorney, attorney general, assistant attorney general, judge or justice of the peace, or any refusal to be sworn as a witness or to sign the testimony given by him or any refusal to answer any proper questions propounded by the county attorney, attorney general or assistant attorney general, in such inquiry,* shall be a misdemeanor and shall be punished by a fine of not more than $300 or be imprisoned in the county jail for not more than ninety days, or by both such fine and imprisonment. Such officers, while so acting as aforesaid, shall have the power to adjourn such proceedings from time to time. *A judge or justice of the peace may fine and imprison any person for contempt on account of his refusal to be sworn or to answer questions as a witness, or to sign the testimony; and the attendance of witnesses may be by such judge or justice of the peace compelled by attachment.* If the testimony so taken shall disclose the fact that an offense has been committed, such county attorney, attorney general or assistant attorney general shall prosecute the person or persons committing such offense and may file such testimony, together with his complaint or information, against such person or persons in some court of competent jurisdiction, and such testimony, with the information or complaint of the county attorney, attorney general or assistant attorney general, verified by him on information and belief, shall have the same effect as if such information or complaint had been verified positively; and thereupon a warrant shall be issued for the arrest of such person or persons as in other criminal cases. *No person shall be excused from testifying in any proceeding as above provided on the ground that his testimony may incriminate him; but no person shall be prosecuted or punished on account of any transaction or matter or thing concerning which he shall be compelled to testify, nor shall such testimony be used against him in any prosecution for any crime or misdemeanor under the laws of this state."* ( Our italics. )

Counsel for petitioners, with commendable frankness, concede that at the time of the inquiry they believed the inquisition was "entirely legal" but that it was conducted in an illegal manner in certain particulars, which will be stated later. They now state the inquisition was wholly illegal and that the above statute does not authorize it. These are original proceedings· in this court. Fundamental rights pertaining to the liberty of citizens are involved and the court is not inclined to rest its decision on technicalities. We shall fully consider petitioners' contentions as now made. This requires first a careful analysis of the above statute.

Petitioners contend the first part of the statute, prior to the first italicized portion thereof, limits the scope and purview of inquiry to acts connected with the three specific classes of offenses therein designated. We believe such a construction of the statute does violence to its declared intent and purpose. The portion of the statute on which petitioners rely does pertain to an investigation

concerning the three subjects specified, by and before the law enforcement officers therein designated. .That, however, is only one portion of the statute. Beginning with the first italicized portion the legislature clearly broadened the extent of inquisitorial powers to include *judicial proceedings* before the district judge, a judge of the city court or justice of the peace. As to judicial proceedings it clearly broadened the scope of an inquisition to include "any offense against the laws of the state." It further empowered such judicial officers to issue subpoenas to witnesses to appear and testify before them. The instant proceedings were all conducted pursuant to the latter part of the statute which pertains to judicial inquisitorial proceedings. Those proceedings included a written statement made by the county attorney to the district court, the issuance of subpoenas by the district court and the hearings before such court.

Under the first part of the statute a refusal to answer proper questions before the officers designated, of course, is not declared to constitute contempt. The right to punish for contempt is expressly limited to a judge or justice of the peace. Moreover, it is well established that district courts of this state, independent of statute, have inherent power to punish for contempt and to make such reasonable orders as are necessary to protect and preserve their judgments. (*State v. Coleman,* 168 Kan. 159, 211 P. 2d 81.) Careful analysis of the entire statute, which is always required to determine legislative intent, clearly indicates an intent to provide two separate and distinct inquisitorial or investigative proceedings which may be employed. The first pertains only to a violation of specific laws mentioned in the first part of the statute and by the officers there named. The other applies to a violation of any state law and a judicial inquiry. We, therefore, are obliged to conclude counsel for petitioners were correct in their first impression that the inquisition itself was "entirely legal."

We shall next consider petitioners' contention the inquisition, as conducted, violated their constitutional guarantees and other legal rights. If that be true petitioners should be promptly released from custody. That is the beneficent purpose of the ancient writ of habeas corpus. That such a sacred right should be most carefully guarded for the protection of the citizen against autocratic power is not debatable under a government dedicated to protect the rights . of its people.

The real question is what are petitioners' rights in the premises?

Can a citizen under a government ordained to protect not only him, but all citizens, from crimes against persons or property refuse to testify when his government calls on him to assist in investigating crimes for the protection of society as a whole? That question, under constitutional guarantees, cannot be answered in the affirmative without definite qualifications.

Petitioners assert the inquisition, as conducted, violated the fifth, sixth and fourteenth amendments to the federal constitution and section ten of the Kansas bill of rights.

The pertinent portion of the fifth amendment reads:

"No person shall be . . . compelled *in any Criminal Case* to be a witness against himself, nor be deprived of life, liberty, or property, *without due process of law*. . . ." (Our italics.)

The sixth amendment, insofar as material, provides:

"In all *criminal prosecutions*, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defence." (Our italics.)

The essential part of the fourteenth amendment states:

". . . No State shall make or enforce any law which shall *abridge the privileges or immunities* of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, *without due process of law*. . . ." (Our italics.)

The material portion of section ten of our bill of rights recites:

"*In all prosecutions*, the accused shall be allowed to appear and defend in person, or by counsel . . . *No person shall be a witness against himself*. . . ." (Our italics.)

The constitutional privilege that a person shall not be required to be a witness against himself is of great value to a citizen accused of crime. But it is well settled that legislative bodies possess the power to authorize investigative proceedings to uncover crimes. Grand juries performed that function for many years before statutes providing for inquisitions such as the one under consideration were enacted. The functions of a grand jury are proceedings in the nature of judicial inquiry and are not criminal prosecutions. (*Hale v. Henkel*, 201 U. S. 43, 63-65, 50 L. ed 652, 26 S. Ct. 370.) Legislatures possess the power to grant amnesty to witnesses and to compel them to give testimony against themselves. Such power long has been recognized as a public necessity in the enforcement of laws. (*State v. Jack*, 69 Kan. 387, 396, 76 Pac. 911; *Jack v. Kansas*, 199 U. S. 372, 50 L. ed 234, 26 S. Ct. 73.)

When immunity from prosecution has been granted on testimony adduced by a witness he no longer has a right to remain silent on

the ground his testimony might incriminate him. The reason is obvious. Personally he then is in the same position as though there were no statute which makes the acts concerning which he testifies a crime.

It must be remembered constitutional guarantees relied on by petitioners, except the fourteenth amendment to the federal constitution, apply only to criminal prosecutions. That is likewise true of section ten of the Kansas bill of rights. This inquisition is not a criminal prosecution. In it petitioners were not charged with any crime. The inquisition is only an investigative process to uncover crimes against the state of Kansas and to ascertain who committed them.

Furthermore, it is unnecessary to cite numerous authorities in support of the long established principle that the first ten amendments to the federal constitution operate on the national government only and were not intended to, and do not, limit the powers of the states in respect to their own people. (*Jack v. Kansas,* supra.)

In our own case of *State v. Jack,* supra, this court had under consideration an inquisition statute similar in all material respects to the instant one. That statute pertained to investigations under our "anti-trust law" in which all the federal and state constitutional guarantees now relied on by petitioners were asserted except the sixth amendment to the federal constitution. The court held the statute was not unconstitutional, that it was a valid exercise of judicial power and the proceeding constituted "due process of law." (p. 394.) It further held that the recalcitrant witness was properly committed to imprisonment for contempt by reason of his refusal to answer questions propounded. It was held:

"The immunity afforded by section 10 of the anti-trust law of 1897 to a witness subpoenaed in a proceeding or inquiry to testify to his knowledge of violations of that law is coextensive with the constitutional privilege that 'no person shall be a witness against himself.'" (Syl. ¶ 3.)

The supreme court of the United States affirmed the decision. (*Jack v. Kansas,* supra.)

Petitioners contend they were deprived of counsel in contravention of the sixth amendment to the federal constitution. From an examination of the record it well may be debatable whether any of them actually demanded or requested counsel. They did, however, object to testifying on the ground they were without counsel. We have indicated previously (1) the sixth amendment to the federal constitution does not apply to state statutes and (2) this

inquisition was a preliminary investigative proceeding to uncover crime and was not a criminal prosecution.

It is well settled an investigation of crime by a grand jury is not a criminal prosecution within the guarantee of the sixth amendment and a witness testifying before it is not entitled to advice of counsel. (*United States v. Blanton*, 77 F. Supp. 812; *Gilmore v. United States*, 129 F. 2d 199, [certiorari denied, 317 U. S. 631, 87 L. ed. 509, 63 S. Ct. 55]; *In re Black*, 47 F. 2d 542.) This court likewise has held a preliminary hearing in a felony case does not fall within the definition of a criminal prosecution and that, absent a statutory requirement, a defendant's rights are not invaded without the appointment of counsel for such a hearing. (*Fry v. Hudspeth*, 165 Kan. 674, 676, 197 P. 2d 945; *Dionne v. Hudspeth*, 166 Kan. 72, 73, 199 P. 2d 176.)

Petitioners stoutly contend the legislative history of the inquisition statute discloses it was not intended the inquisition should be held in secret. We shall not burden the opinion with a lengthy discussion of the subject. There is nothing in the present statute which in anywise indicates a public hearing is contemplated. Proceedings before grand juries and similar investigative bodies seldom, if ever, have been conducted publicly. The reasons are clear. Some of the reasons for conducting such an investigation without publicity are the importance of preventing scheming and conspiring to nullify the effectiveness of inquisitorial functions and to avoid the escape of those who later might be prosecuted by reason of facts disclosed. Another reason is the cloak of secrecy protects witnesses, willing to assist in bringing to justice those who may be endangering the safety of society from unnecessary censure, criticism and abuse. (*State v. Branch*, 68 N. C. 186.) Constitutional provisions which require that an accused be permitted to meet witnesses face to face apply only to criminal prosecutions and not to mere investigative proceedings. Petitioners had not been accused of committing any crime.

Petitioners urge the statute provides no immunity from prosecution for violation of federal laws as distinct from state laws and the immunity guaranteed in the instant inquisition was, therefore, inadequate. The testimony elicited in this proceeding, which petitioners refused to answer, relates only to a violation of state laws. Under these circumstances petitioners are not in a position to complain immunity from prosecution under federal laws was not guaranteed. Moreover, the validity of petitioners' contention has been denied in connection with an inquisition conducted under our state

"anti-trust law" even though a federal statute governing the same subject matter existed as applied to interstate commerce. In *State v. Jack,* supra, this court held:

"A witness subpoenaed in a proceeding or inquiry to testify of his knowledge of violations of the anti-trust law cannot refuse to give his evidence on the ground that the immunity provided by section 10 of the act does not afford protection against the use of his evidence in a prosecution against him for violations of the federal anti-trust law." (Syl. ¶ 4.)

On appeal to the supreme court of the United States that court in *Jack v. Kansas,* supra, held:

"The provisions in the Kansas anti-trust law, as construed by the highest court of that State, compelling witnesses to testify as to violations of the act, and granting immunity from prosecution for violations testified to, or the use of the testimony against the witness, are not void under the Fourteenth Amendment, because immunity from Federal prosecution is not granted; and one committed, in accord with the provisions of the statute, for contempt for refusing to testify to acts within his knowledge is not deprived of his liberty without due process of law." (p. 372.)

See, also, *Hale v. Henkel,* supra, p. 68, in which *State v. Jack,* supra, and *Jack v. Kansas,* supra, are cited and again approved.

Petitioners complain of the presence and participation of special attorneys in the inquisition. They were all appointed pursuant to a resolution of the board of county commissioners at the nominal salary of $1.00 each to assist the county attorney in conducting the proceedings. The law authorizes the action of the board. (G. S. 1949, 19-723; 28-319; *Womer v. Aldridge,* 155 Kan. 446, 125 P. 2d 392.) Such attorneys were all duly sworn to discharge their duties as deputy county attorneys. As deputies they were only assisting the county attorney and had a right to act in that capacity. (*State v. McCombs,* 163 Kan. 225, 228, 181 P. 2d 473.)

The official transcripts of the original proceedings in each case have been carefully examined. We find no attempt to have them amended in any particular. They reflect no conduct which would justify nullifying the proceedings.

Petitioners argue the sentences and commitments for direct contempt are invalid in that they violate constitutional and statutory provisions. Briefly stated, petitioners assert they were accused of contempt, tried, convicted, sentenced and committed without formal charges first having been preferred against them, and without evidence or counsel.

Before proceeding to discuss the subject of contempt it clearly should be stated the penal provision of the statute making refusal

to testify a misdemeanor punishable by fine or imprisonment, or both, was not invoked in these cases and we are not now concerned therewith. The court exercised only the statutory authority conferred upon it relative to direct contempt. And, as previously indicated, it had that inherent power independent of statute.

Petitioners' contention fails to recognize the distinction between direct and indirect contempt. It ignores the statute which provides persons shall be proceeded against for direct and indirect contempt only as prescribed by statute. (G. S. 1949, 20-1201.)

G. S. 1949, 20-1202 distinguishes between direct and indirect contempt as follows:

"That contempts committed during the sitting of the court or of a judge at chambers, in its or his presence, are direct contempts. All others are indirect contempts."

In proceedings for indirect contempt the law requires a written accusation, answer of the accused, a trial and a judgment based on testimony. That law also provides if the accused files an answer the trial proceeds on testimony as in criminal cases and the accused is entitled to be confronted with the witnesses against him. (G. S. 1949, 20-1204.)

In proceedings for direct contempt the law is entirely different. G. S. 1949, 20-1203 provides:

"That a direct contempt *may be punished summarily, without written accusation against the person arraigned,* but if the court or judge in chambers shall adjudge him guilty thereof a judgment shall be entered, of record, in which shall be specified the conduct constituting such contempt, with a statement of whatever defense or extenuation the accused offered thereto, and the sentence of the court thereon." (Our italics.)

G. S. 1949, 20-302 reads:

"The judges of the district courts, within their respective districts, shall have and exercise such power in vacation or at chambers as may be provided by law, and shall also have power . . . to punish for contempt in open court or at chambers, by fine, not to exceed one hundred dollars, and imprisonment, or either, and to assign not exceeding one attorney to prisoners who may be unable to employ counsel."

The last preceding section does not limit contempt powers except in chambers. (*In re Millington, Petitioner, &c.,* 24 Kan. 214.)

Here we are concerned only with direct contempt of court committed in the presence of the presiding judge who had personal knowledge of exactly what transpired. In *Savin, Petitioner,* 131 U. S. 267, 33 L. ed 150, 9 S. Ct. 699, the court, speaking by Mr. Justice Harlan, said:

"We are of opinion that, within the meaning of the statute, the court, at least when in session, is present in every part of the place set apart for its own use, and for the use of its officers, jurors and witnesses; and misbehavior anywhere in such place is misbehavior in the presence of the court. It is true that the mode of proceeding for contempt is not the same in every case of such misbehavior. Where the contempt is committed directly under the eye or within the view of the court, it may proceed 'upon its own knowledge of the facts, and punish the offender, without further proof, and without issue or trial in any form,' *Ex parte Terry*, 128 U. S. 289, 309; whereas, in cases of misbehavior of which the judge cannot have such personal knowledge, and is informed thereof only by the confession of the party, or by the testimony under oath of others, the proper practice is, by rule or other process, to require the offender to appear and show cause why he should not be punished." (p. 277.)

And in *Cooke v. United States*, 267 U. S. 517, 69 L. ed. 767, 45 S. Ct. 390, Mr. Chief Justice Taft, speaking for the court, stated:

"To preserve order in the court room for the proper conduct of business, the court must act instantly to suppress disturbance or violence or physical obstruction or disrespect to the court when occurring in open court. *There is no need of evidence or assistance of counsel before punishment, because the court has seen the offense.* Such summary vindication of the court's dignity and authority is necessary. It has always been so in the courts of the common law and the punishment imposed is due process of law." (Our italics.) (p. 534.)

Petitioners further argue there was no compliance with G. S. 1949, 20-1203 for the reason they were committed before judgment was entered of record. The journal entries in all three cases bear the exact dates on which petitioners were sentenced and committed. There is no evidence the journal entries were not prepared and signed by the district court judge on those dates. It is true that in two of the cases the journal entries were not actually filed until four days later and in one of them five days later. The official transcript of the record in each case, however, discloses sentence was pronounced and the petitioner was committed on the date indicated in the journal entries and at the time the witness refused to testify. A journal entry is evidence of the judgment rendered. Our view is the judgments of the court were properly preserved in the official records and there was substantial compliance with the statute in cases of direct contempt. The official records preserved every act sufficiently to enable this court to examine the validity of every contention now advanced by petitioners or which might have been presented on a direct appeal from the judgment rendered under the provisions of G. S. 1949, 20-1205. The journal entires also complied with the requirements of G. S. 1949, 20-1203 in all other respects. On the subject of an insufficient record petitioners rely heavily on

*Wallace v. Weber,* 134 Kan. 201, 5 P. 2d 855. A reading of the opinion will readily disclose no record of any kind was there made in the police court, where the alleged contempt occurred, until long after sentence was pronounced and the commitment was issued. In that case this court affirmed the decision of the district court releasing petitioner from custody on the ground of utter failure to comply with the provisions of the statute concerning the preserving of a record. In fact, the record of the police judge was so incomplete and imperfect it was difficult to ascertain what occurred at the contempt hearing. Furthermore the commitment itself did not state the facts upon which the contempt judgment was founded.

The syllabus in the Wallace case does not support petitioners' contention. If any portion of the opinion in that case is properly subject to the interpretation that in case of direct contempt a district judge is compelled to halt all judicial proceedings and prepare and file a formal accusation of contempt or file a journal entry of judgment before he pronounces sentence and issues a commitment, it is overruled.

We think it is proper to say these cases were advanced for special hearing in order to comply with the urgent request of the parties for an early decision. In view of that request we have not extended the opinion with citation of additional authorities or with a review of numerous cases supplied by the industry of respective counsel. Their careful examination, however, has not altered or modified the views herein expressed. A few other interesting but not determinative matters referred to by counsel for the respective parties need not be treated in view of conclusions previously expressed.

The petitions for writs must be denied. It is so ordered.

Smith, J. (dissenting): I find myself unable to agree with the opinion of the majority as to the statement of law contained in paragraph 2 of the syllabus and the corresponding part of the opinion.

My view is, only the first part of G. S. 1949, 62-301, confers authority and jurisdiction on any official or court to hold an inquisition. That applies to the laws of the state relating to gambling, intoxicating liquor or any violation of any law where the accused is a fugitive from justice. There is no pretense the case here falls into any one of those three categories. The remainder of the section refers only to procedural matters.

My basis for this conclusion is partly historical. The first of the

inquisition statutes was enacted and passed in 1885. It was part of a chapter that amended the prohibitory law in force at that time, then in an experimental stage. Since that time we have had many attorneys general, assistant attorneys general and thousands of county attorneys. Not one of them up to now ever used that statute in conducting an inquisition such as this, except under the three categories named.

What took place in this case is as potent an argument as could be made why the legislature never intended to give such sweeping powers to any court.

Here in the case of Courtney, the petitioner was punished, not for refusal to answer any particular question, but for refusal to answer a question the way the special assistant attorney desired it to be answered. This official was exploring the question of to whom Courtney gave some fluid when he brought it to strike headquarters in his car. It is clear from the transcript that Courtney meant to say he did not give it to anybody, but whoever took it knew it was in his car and came and got it from his car. The officials present, and there were none but officials present, were determined that he should say to whom he gave this and when he was unable to do so decided to punish him for contempt. Had they believed he was testifying falsely the remedy of the state was to try him for perjury, not to punish him for contempt. Such conduct is what the legislature endeavored to guard against by refusing to give such drastic power to courts and law enforcement officials.

The argument, the grand jury performed the function of investigation of crimes before statutes providing for inquisitions were enacted, leaving the implication there is more necessity for an inquisition statute relating to crimes generally than there was before, is not sound. I would be persuaded by it were it not for the fact the grand jury statute has continued on our books ever since first enacted in the early days of statehood. It is still extensively used where deemed necessary in ascertaining whether or not crimes have been committed. There is a great deal of difference in the consideration given the individual citizen when he is called to testify before a grand jury than when he is called before a judge of the district court holding a purported inquisition such as the majority opinion holds this statute provided for.

The grand jury is comprised of citizens of the community to which the witness belongs. There are twelve or more of his peers there on the grand jury when he is called upon to testify. The statute pro-

vides they shall be picked by lot. That is a far different affair from an inquisition such as described here, where the witness is called in before a battery of county attorneys, special county attorneys and police officers before a court selected by those officials when the inquisition was begun. This, in my opinion, is the reason the legislature never did intend that G. S. 1949, 62-301, should be given the construction the majority opinion gives it.

A persuasive incident to me is that when these men were sentenced, in one case to three months, and in the other cases to a year in the county jail, the sentences were not in the alternative that they should purge themselves of contempt, but were direct sentences to that much of a term in the county jail.

The entire affair was punitive and not in the interest of obtaining evidence. Had the investigation been carried on in good faith the sentences would have been, petitioners should be confined in the county jail for the terms indicated or until they should purge themselves of contempt.

Counsel in the oral argument stated such would be the construction given, that is, they would be offered an opportunity to purge themselves, but nowhere in this record do we find any such a provision in the so-called sentences.

It should never be overlooked, the qualification and the only qualification for an inquisitorial statute is to obtain information. It is not punitive. The state in these proceedings argues in one breath the purpose is as above, hence the constitutional safeguards do not apply, and in the next breath conducts the inquisition so that the net result is punitive.

Should these petitioners see fit to stay in jail for the terms for which they were sentenced, and there is no indication they may be afforded an opportunity to do otherwise, then the end the state advances in the inquisition will be defeated.

Actually the state is by this proceeding avoiding the necessity for calling a grand jury. That is a time-honored institution for which our statutes still provide. It is calculated to safeguard the rights of witnesses as well as to aid in intelligent law enforcement.

Granting for the sake of argument that the inquisition had a legal basis, still I am convinced the record in this case requires the granting of these writs. G. S. 1949, 62-301, provides, among other things, a witness may be imprisoned for contempt for any refusal to answer questions. This must be construed to mean any proper question or any question asked for the purpose of securing in-

formation bearing on the commission of any crime. That must be the proper construction since such is the only reason to justify an inquisition such as this. Obviously before a witness could be punished for contempt for refusing to answer a question, it must appear he was in possession of some such information. The matter of the testimony of Courtney, who was sentenced to three months in jail, has been dealt with already in this dissenting opinion. In the cases of Ferris and Park, each of whom was sentenced to a term in jail of a year, the transcript of the proceeding attached to the sheriff's return shows the only question asked either one of them bearing on his possession of information was whether he was a striking taxicab driver. There was no testimony whatever that either one of them knew any facts useful to the state. No questions were asked bearing upon the commission of any acts of violence.

These petitioners have been deprived of their liberty for a year. In my opinion where such a judgment is entered, be it the result of a conviction before a jury, or after a contempt proceedings, the basis therefor should be clear and free from doubt.

It is my opinion, the orders sentencing these petitioners were arbitrary and unreasonable and in making them the court abused its discretion. The fact that these sentences did not offer the petitioners the privilege of purging themselves of contempt by testifying adds weight to the above conclusion.