No. 80,015

In The Matter of An Order To Summon Grand Jury

(979 P.2d 672)

Opinion filed April 16, 1999.

*M. Ruth O'Neill*, of Overland Park, argued the cause and was on the briefs for appellant Torre Conway.

*R. Douglas Sebelius*, county attorney, argued the cause, and *Carla J. Stovall*, attorney general, was with him on the brief for appellee Norton County.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Torre Conway appeals from an order of the district court finding her in contempt of court for refusing to give a grand jury the names of contributors to Healthcare Organization Promoting Excellence, Inc., (HOPE). This court transferred the appeal from the Court of Appeals. This is a companion case to *State v. Snodgrass*, 267 Kan. 185, 979 P.2d 664 (1999), in that it arises from the same grand jury proceedings in Norton County.

As a result of the grand jury proceedings, indictments were issued in October 1997 against Lillian Snodgrass, Torre Conway, and HOPE. Each was charged with criminal defamation and making false writings for submitting complaints to state and federal regulatory agencies in order "to gain control, power and influence over

the affairs of the Norton County Hospital, and further, to retaliate and punish members of said Hospital's staff, Board of Trustees and administration." Following a change of venue to Graham County, an assigned district judge dismissed the indictments. That district court's dismissal of the indictments is the subject of the State's appeal in *Snodgrass*.

The principal subject of this appeal is the Norton District Court's order of contempt entered against Torre Conway on October 3, 1997. Conway was called as a witness before the grand jury. The prosecutor requested an order compelling Conway, an officer of the corporation, to reveal the names of the contributors to HOPE. The district court found that the question was appropriate and should be answered by Conway. Before the grand jury, the witness refused on the ground that her answers might tend to incriminate her. At the request of the prosecutor, the district court granted immunity to Conway from prosecution or punishment for "[m]aintaining, reconstructing, recollecting or disclosing a list of contributors" to HOPE and for "receiving and processing contributions" to HOPE. Because Conway refused to comply with the order to reveal the names of the contributors to HOPE, the district court imposed on her a "fine of $200.00 per day, seven (7) days a week, as long as the Grand Jury is in service, including any extensions thereof, until contempt is purged by contacting the Presiding Juror that her answers will be forthcoming." Additional facts will be related as necessary for determining the issues raised by Conway.

After the parties had filed their briefs in this appeal, including a reply brief by appellant Conway, the Graham District Court dismissed the indictments against Snodgrass, Conway, and HOPE. The district court found that the grand jury was not properly impaneled because there was no showing in the record that the jurors were legally qualified.

After obtaining permission from this court, Conway supplemented the record in this case and filed a supplemental brief in which she raised two new issues, claiming invalidity of the contempt order based upon the Graham District Court's finding in *Snodgrass* that the grand jury was unlawfully impaneled. We have

this day reversed the district court's dismissal of the indictments in *Snodgrass*, and that decision is controlling as to those two issues.

Conway first contends that the contempt order is invalid because it was entered in closed grand jury proceedings rather than in open court. On July 15, 1997, Conway was served with a subpoena duces tecum to appear before the grand jury and to produce membership lists and contribution records for HOPE. In a verified application filed in the district court on September 16, 1997, the presiding grand juror, Melvin Rice, sought a citation in contempt against Conway. He stated that on July 28 Conway failed to produce either membership lists or contribution records as directed and that on September 4 she requested additional time for production. Rice attached a copy of the contribution record that eventually was furnished by Conway. It is a hand-written, two-column document titled "Donations." In the column headed with the word "Contributor" are 4- to 8-digit numbers rather than names; in the column headed with the abbreviation "Amt." are numbers in the format of dollars and cents. The number 655.00 appears at the bottom of the "Amt." column. On September 22, Conway was personally served with a citation that ordered her to appear before the District Court of Norton County on September 25 to "show cause, if any, why you should not be adjudged guilty of contempt of Court and punished accordingly."

The September 25 proceedings were transcribed. Conway appeared with counsel; also present were Rice and the county attorney. The district judge stated that he had read the written response to the order to show cause, which had been filed on behalf of Conway. The judge ordered Conway to provide to the grand jury a list of the members of HOPE and the names of the contributors. Conway's attorney announced her intention to appeal the ruling and asked the district court to stay the order. Conway filed a notice of appeal the same day. Also on September 25, 1997, Conway filed a motion "to quash the testimonial sub peona [*sic*]" that required Conway's presence before the grand jury on September 29 and a "Motion for Reconsideration/Motion to Clarify Prior Order" and requested a hearing. She raised First Amendment grounds for quashing the subpoena. At a hearing on September 26, the district

court reiterated the order that Conway, secretary/treasurer of HOPE, produce existing lists of members and contributors. A journal entry denying Conway's motions was filed on October 3.

On September 29, 1997, in a closed grand jury proceeding, Conway invoked her Fifth Amendment privilege against self-incrimination when asked about lists of members and contributors. She also referred to her affidavit, which stated: "[W]e do not have a list."

On October 2, Conway and her attorney, the county attorney, and Rice appeared before the district court. The proceedings were opened with the following exchange:

"THE COURT: Please be seated. First, let the record reflect this is a proceeding from the grand jury, the grand jury has requested I be present during questioning a witness, is that correct, Mr. Rice?

"MR. RICE: Yes.

"THE COURT: Then these would still be grand jury proceedings; therefore they are not public. The court is here at the request of the foreman to rule upon questions of law. So since it is part of the proceedings, then it is closed hearing pursuant to the grand jury statute 22-3010. I'm going to ask all those parties to please leave except grand jury members, the witness and witness's counsel. . . .

". . . Mr. Sebelius, you filed this specific motion concerning the questions that you wish to have answered, correct?

"MR. SEBELIUS: Yes. I filed request for order to compel the answers of the witness. . . .
. . . .

"THE COURT: . . . [T]here are three questions. First one, who are the members of the Health Care Organization Promoting Excellence, Inc. Second, what are the names of the contributors that correspond to the contributors designated [in the coded list] provided to the grand jury by Torre Conway. Three, what is the formula that you have used to convert the numbers that appear [in the coded list] to a[n] individual contributor's name?"

When the district judge stated that the witness should answer the questions, Conway's counsel announced that Conway was exercising her Fifth Amendment privilege against self-incrimination. During the proceedings, the court signed an order prepared by the county attorney that granted immunity to Conway and HOPE from prosecution or punishment for the following acts:

Maintaining, reconstructing, recollecting or disclosing a list of members of HOPE;

maintaining, reconstructing, recollecting or disclosing a list of contributors of HOPE; and

receiving and processing contributions made to HOPE.

The witness stated that there was no list of members. With that declaration, the list of members was eliminated from consideration. Conway was sworn and asked by the district judge to reveal either the names of the contributors or the formula. She refused. The judge directed her to answer the question, and she declined, stating: "And because I feel that these people would suffer retaliation if I disclose their names, I cannot do that." The judge pointed out that the Fifth Amendment privilege was not involved because her concern was not self-incrimination. She responded that she had previously raised the Fifth Amendment. Her attorney also made it clear to the court that, due to the limited immunity granted by the State, she was claiming her Fifth Amendment privilege against self-incrimination. The judge again directed her to provide the names of the contributors and warned that her failure to do so would result in her being found in contempt of court and fined $200 a day. The witness refused to comply. The written order of contempt was filed on October 3, 1997.

Kansas statutes divide contempts of court into two broad classes: direct and indirect. K.S.A. 20-1201. "That contempts committed during the sitting of the court or of a judge at chambers, in its or his presence, are direct contempts. All others are indirect contempts." K.S.A. 20-1202. In *State v. Jenkins*, 263 Kan. 351, 950 P.2d 1338 (1997), the court adopted a third category, a hybrid contempt, for absence or tardiness. The contemptuous conduct is the failure to be in the presence of the judge at an appointed time. The hybrid approach is not applicable in the circumstances of the present case. Direct contempt "may be punished summarily, without written accusation against the person arraigned." K.S.A. 20-1203. It is comparable to the contempt and summary disposition described in Fed. R. Crim. Proc. 42(a). A more elaborate procedure is involved for indirect contempt. "In order to institute a proceeding for indirect contempt, a party is required to file 'a motion requesting an order to appear and show cause which is accompanied by an *affidavit specifically setting forth the facts constituting*

*the alleged violation.'* (Emphasis added.)" *Meigs v. Black*, 25 Kan. App. 2d 241, 242, 960 P.2d 770 (1998) (quoting K.S.A. 1997 Supp. 20-1204a). The specific topics addressed in subsections (e), (f), and (g) of K.S.A. 1998 Supp. 20-1204a show that the legislature intended the indirect contempt procedure to be a useful tool in enforcement of restraining orders, child support orders, and the like. K.S.A. 1998 Supp. 20-1204a does not provide for trial by jury. Instead, the statute calls for issuance of an order to appear and show cause before the court. "If the court determines that a person is guilty of contempt such person shall be punished as the court shall direct." K.S.A. 1998 Supp. 20-1204a(b).

Conway completely disregards the Kansas statutory scheme for contempt proceedings. The State briefly alluded to it, noting that the district court "made a finding of direct contempt" and that "[p]rocedural steps are not mandated by statute. K.S.A. 20-1203." The contemptuous conduct in the present case occurred in the presence of the district judge, who was in his courtroom and in attendance, at the request of the grand jury to rule on questions of law when it convened on October 2, 1997. There would seem to be no question that Conway's refusal to answer was direct contempt as contemplated by the Kansas Legislature. K.S.A. 20-1203 authorizes the district court to summarily punish direct contempt. Conway contends that any contempt order must be made in open court rather than in secret grand jury proceedings in order to satisfy due process requirements. She principally relies on *Harris v. United States*, 382 U.S. 162, 15 L. Ed. 2d 240, 86 S. Ct. 352 (1965), and *In re Investigation into Homicide of T.H.*, 23 Kan. App. 2d 471, 932 P.2d 1023 (1997).

In *Homicide of T.H.*, the Court of Appeals considered whether it was necessary for a contempt proceeding held in conjunction with an inquisition to be conducted publicly and concluded that it was. Discussion of the issue is brief and is set out here in full:

"The United States Supreme Court has specifically held that contempt proceedings arising from an inquisition in Kansas and held in secret violate the Fourteenth Amendment Due Process Clause. *Courtney, et al. v. Schroeder*, 348 U.S. 933, 99 L. Ed. 732, 75 S. Ct. 355 (1955), reversing *In re Ferris*, 175 Kan. 704, 267 P.2d 190 (1954).

"In *In re Oliver*, 333 U.S. 257, 272-73, 92 L. Ed. 682, 68 S. Ct. 499 (1948), the Court held that a defendant charged with contempt arising from Michigan's 'one-man grand jury' had to be afforded a public hearing on the contempt charge. The Court did not pass on the validity of the secret one-man grand jury proceedings. Instead, the Court distinguished the witness' rights in the grand jury proceedings from his rights as a defendant in the contempt proceedings. Although the Michigan one-man grand jury differed from the Kansas inquisition statute, the Court in *Schroeder* held that the same rule applied to the Kansas inquisition. 348 U.S. 933, see Comment, *The Inquisition in Kansas—Its Use, Disuse, and Abuse*, 6 Kan. L. Rev. 452, 459-61 (1958). The important point to be drawn from these cases is that contempt proceedings arising from an inquisition and held in secret violate the Fourteenth Amendment Due Process Clause." 23 Kan. App. 2d at 484-85.

There are differences between an inquisition and the grand jury proceedings at issue here. Although a grand jury acts independently of the district court, it remains an adjunct of the court under whose supervision it is impaneled. The county attorney has a limited role in the grand jury proceedings. In contrast, the inquisition statutes, K.S.A. 22-3101 *et seq.*, authorize a prosecutor, upon verified application to a district judge, to subpoena witnesses and question them under oath about alleged violations of Kansas laws. It appears from the statutes that initially the prosecuting attorney, the witness, the witness' counsel, if any, and a reporter are present at an inquisition. See K.S.A. 22-3101(1) and (3), K.S.A. 22-3104. Initially, therefore, an inquisition witness' refusal to answer would be indirect contempt and would be subject to the procedural requirements of K.S.A. 1998 Supp. 20-1204a. In the present case, although Conway's initial refusal to answer occurred before the grand jurors, her subsequent refusal to answer occurred in the presence of the district judge.

The same procedure was evidently followed in *In re Ferris*, 175 Kan. 704, 267 P.2d 190 (1954). There, the petitioners refused to answer questions asked in an inquisition and refused again before the district judge. This court stated: "Here we are concerned only with direct contempt of court committed in the presence of the presiding judge who had personal knowledge of exactly what transpired." 175 Kan. at 714. In *Ferris*, as in the present case, the proceedings before the district judge were not open to the public.

In *Courtney et al. v. Schroeder,* 348 U.S. 933, 99 L. Ed. 732, 75 S. Ct. 355 (1955), the United States Supreme Court reversed *Ferris* based upon its decision in *In re Oliver,* 333 U.S. 257, 92 L. Ed. 682, 68 S. Ct. 499 (1948). In *Oliver,* the Court noted:

"Many reasons have been advanced to support grand jury secrecy. See, *e.g., Hale v. Henkel,* 201 U.S. 43, 58-66; *State v. Branch,* 68 N.C. 186. But those reasons have never been thought to justify secrecy in the trial of an accused charged with violation of law for which he may be fined or sent to jail. . . . Even when witnesses before grand juries refuse to answer proper questions, the grand juries do not adjudge the witnesses guilty of contempt of court in secret or in public or at all. Witnesses who refuse to testify before grand juries are tried on contempt charges before judges sitting in open court. . . .

. . . .

". . . Counsel have not cited and we have been unable to find a single instance of a criminal trial conducted in camera in any federal, state, or municipal court during the history of this country. Nor have we found any record of even one such secret criminal trial in England since abolition of the Court of Star Chamber in 1641, and whether that court ever convicted people secretly is in dispute. Summary trials for alleged misconduct called contempt of court have not been regarded as an exception to this universal rule against secret trials, unless some other Michigan one-man grand jury case may represent such an exception." 333 U.S. at 264-66.

The Supreme Court concluded, based on "this nation's historic distrust of secret proceedings, their inherent dangers to freedom, and the universal requirement of our federal and state governments that criminal trials be public," 333 U.S. at 273, that due process requires contempt proceedings to be public.

The question in *Harris,* the other case heavily relied on by Conway, was whether the summary proceeding authorized by Fed. R. Crim. Proc. 42(a) or the normal procedure, which entitled the accused to a public *trial by jury,* under Rule 42(b) was applicable to a witness' refusal to comply with the direction of the district court to answer questions propounded before a grand jury. The issue was not a constitutional matter, nor was it a matter of a right to appear in open court.

For the proposition that a "summary finding is proper" for a direct contempt, "committed in the immediate presence of the court," the State cites *United States v. Wilson,* 421 U.S. 309, 44 L. Ed. 2d 186, 95 S. Ct. 1802 (1975). The case does not support the

State's position, but, because it involves federal procedure, it does not undermine it either.

Conway does not challenge the constitutionality of this state's statutory provisions for direct contempt. She only questions whether the district court's holding her in contempt had to be done in open court. We conclude that it does. As the Supreme Court noted in *Oliver*:

> "Here we are concerned, not with petitioner's rights as a witness in a secret grand jury session, but with his rights as a defendant in a contempt proceeding. The powers of the judge-grand jury who tried and convicted him in secret and sentenced him to jail on a charge of false and evasive swearing must likewise be measured, not by the limitations applicable to grand jury proceedings, but by the constitutional standards applicable to court proceedings in which an accused may be sentenced to fine or imprisonment or both." 333 U.S. at 265.

We find *Oliver* to be controlling, and the failure of the district judge to proceed with the contempt proceedings in open court violated Conway's right to due process.

Conway also argues that the order of contempt cannot stand because the grant of immunity did not meet statutory and constitutional standards. K.S.A. 22-3008(4) provides, in part:

> "No witness before a grand jury shall be required to incriminate the witness' self. The district judge may, if the judge determines that the interest of justice requires, grant any witness before the grand jury immunity from prosecution or punishment on account of any matter concerning which the witness shall be compelled to testify."

After the district judge signed the order granting immunity to Conway, she was sworn and the judge questioned her. When asked for the names of the contributors to HOPE, Conway responded:

> "THE WITNESS: And because I feel that these people would suffer retaliation if I disclose their names, I cannot do that.
> "THE COURT: Okay. You are not going to answer the question, and you're not claiming upon Fifth Amendment, you're making a claim based upon you're afraid something is going to happen to someone else?
> "THE WITNESS: I have previously claimed the Fifth Amendment.
> "THE COURT: All right. The Court is going to direct you answer the question, but if you fail to do so, I'll find you in contempt of court."

After conferring with Conway, her counsel announced that Conway would not answer the question. Counsel stated, "[M]y client continues to believe that complying with that order would result in a violation of her right against self-incrimination and the Fifth Amendment, which goes beyond the scope of the limited grant of immunity that was issued here today."

On appeal, Conway declares that because the district judge granted immunity and because the State has not cross-appealed the question of her self-incrimination, whether she properly invoked her constitutional protection from self-incrimination is not before this court. Conway's claim is that the order of contempt is invalid because the grant of immunity was too narrow under the statute and the Constitution, which excused her from answering. Notwithstanding the district judge's comment to the contrary, Conway did claim her Fifth Amendment right against self-incrimination. Further, she is absolutely correct in pointing out that the State has never questioned whether self-incrimination was involved. The State had ample opportunity to raise this question before the district court but did not. The State prepared the request for a grant of immunity based on self-incrimination and was present when the district judge attended the grand jury proceeding to receive and act on it. And, as Conway pointed out, the State did not cross-appeal. Having claimed her Fifth Amendment right against self-incrimination, the scope of the immunity granted is crucial in determining if Conway was in contempt of court.

Conway contends that the district court failed to require the State to establish that the interests of justice required her to answer the questions about HOPE's contributors. Her contention is unfounded. After reviewing the questions the grand jury wanted Conway to answer, the district judge observed on the record that the questions already had been the subject of a hearing and that he determined them to be "appropriate." Only then did he direct the witness to answer the questions.

The crux of Conway's complaint about the grant of immunity is that it was not as broad as required by 22-3008(4). The testimony sought from Conway were names of HOPE's contributors. Conway was granted immunity from prosecution or punishment for making

or disclosing a list of HOPE's contributors and for handling contributions to HOPE. The statute provides for "immunity from prosecution or punishment on account of any matter concerning which the witness shall be compelled to testify." The language of the statute would seem to provide for immunity broader than protection from punishment for making a list, revealing a list, or handling contributions. In the legislature's phrase, the witness should be protected from punishment "on account of *any matter* concerning" the contributors to HOPE.

Conway contends that 22-3008(4) requires a grant of transactional immunity. In *Kastigar v. United States*, 406 U.S. 441, 32 L. Ed. 2d 212, 92 S. Ct. 1653, *reh. denied* 408 U.S. 931 (1972), two types of immunity were discussed. Transactional immunity "accords full immunity from prosecution for the offense to which the compelled testimony relates." 406 U.S. at 453. Use immunity protects the witness from "use of compelled testimony, as well as evidence derived directly and indirectly therefrom." 406 U.S. at 453.

Conway contends that the immunity provision of K.S.A. 22-3008(4) is broader than the general immunity contained in K.S.A. 22-3415. She argues that the plain language of 22-3008(4) requires transactional immunity and adds that as to the two recognized types of immunity, only use immunity is contained in 22-3415, the general immunity statute, and 22-3008(4), the immunity statute for grand jury witnesses only provides for transactional. K.S.A. 22-3415 provides, in part:

"The county or district attorney or the attorney general may at any time, on behalf of the state, grant in writing to any person immunity from prosecution or punishment on account of any transaction or matter contained in any statement or about which such person shall be compelled to testify and such statement or testimony shall not be used against such person in any prosecution for a crime under the laws of Kansas or any municipal ordinance."

Although only part of her reasoning is supported by *In re Birdsong*, 216 Kan. 297, 532 P.2d 1301 (1975), the "bottom line" of Conway's contention is supported. In *Birdsong*, this court construed the general immunity statute as follows:

"It appears from our reading of the statute that both a transactional immunity and a use immunity [are] provided. Under the Kansas statute (K.S.A. 22-3415

[Weeks]) immunity is granted on account of any transaction or matter about which such person is compelled to testify (transactional immunity). In addition the statute provides that such testimony *shall not be used* against such person *in any prosecution for crime* (use immunity)." 216 Kan. at 304.

The language of 22-3415 which the court construed as granting transactional immunity is very similar to the language of 22-3008(4). The logical conclusion to be drawn from this comparison is that the immunity provided by statute for grand jury witnesses is transactional.

In *Birdsong*, this court recognized that a grant of transactional immunity is coextensive with a witness' constitutional privilege against self-incrimination, and if granted, a witness must testify. 216 Kan. at 305. There is no question that the grant of immunity to Conway was limited and did not grant her transactional immunity. We interpret K.S.A. 22-3008(4) to require a grant of transactional immunity before a witness can be compelled to testify. Here, the immunity granted to Conway was not coextensive with her privilege against compulsory self-incrimination; thus, she could not be compelled to testify. The order finding her in contempt of court is invalid and must be set aside.

The judgment of the district court is reversed.